IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| RENE SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-1349-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | ) ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

**INTRODUCTION**

Pursuant to 42 USC § 405(g), plaintiff, Rene Sanders ("Sanders"), seeks judicial review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-433. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons discussed below, the Commissioner's decision is affirmed.

1 - OPINION AND ORDER

## PROCEDURAL BACKGROUND

On May 30, 2001, Sanders filed an application for DIB, alleging disability since January 1, 1997, due to carpal tunnel syndrome, right knee surgery, back impairments, varicose vein surgery, temporary memory loss, and an inability to stay focused. Tr. 109-11, 117.[1] Sanders earned sufficient quarters of coverage to remain insured through March 31, 1999.

Sanders' application was denied initially and on reconsideration. Tr. 28-29. Pursuant to Sanders' request, a hearing was held on June 17, 2002, and then continued for the purpose of obtaining a consultative psychological examination. Tr. 796-806. A supplemental hearing took place on November 19, 2002, at which Sanders, his brother, and a Vocational Expert ("VE"), testified. Tr. 807-54.

On February 13, 2003, Administrative Law Judge ("ALJ") Riley J. Atkins issued a decision denying Sanders' request for DIB. Tr. 15-25. Sanders requested review of the ALJ's decision, which the Appeals Council denied on July 22, 2004. Tr. 4-8. Accordingly, the ALJ's decision became the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

---

[1] Citations are to the page number of the transcript of the record filed with the Commissioner's Answer.

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR §§ 404.1520.

At step one, the ALJ found that Sanders had not engaged in substantial gainful activity since January 1, 1997. Tr. 16, 23 (Finding #2); 20 CFR § 404.1520(b).

At step two, the ALJ found that Sanders had the severe impairments of a history of multiple arthralgias, status post carpal tunnel release, and alcohol and cocaine dependence/abuse. Tr. 16, 23 (Finding #3); 20 CFR §§ 404.1520(c). The ALJ also found that Sanders' other impairments were not severe, and that his impairments did not meet or equal a listed impairment. Tr. 16, 23 (Finding #3).

If the adjudication proceeds to step three, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96-8p. The ALJ determined that Sanders had limited credibility and retained the RFC to perform medium work, but which precluded repetitive, overhead work. Tr. 17, 23-24 (Findings #5 & #8). The ALJ also included additional non-exertional limitations which are discussed in more detail below.

///
///

At step four the Commissioner will find the claimant is not disabled if he or she retains the RFC to perform work he or she has done in the past. 20 CFR § 404.1520(e). The ALJ found that Sanders was no longer able to perform any of his past work. Tr. 24 (Finding #6).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(f). The burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566. Relying upon testimony from a vocational expert, the ALJ found that Sanders could perform a significant number of jobs existing in the national economy, specifically jobs as an inventory worker, janitor, and shipping-receiving clerk. Tr. 24 (Finding #10).

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the

4 - OPINION AND ORDER

Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## STATEMENT OF THE FACTS

### I. Sanders' History

Sanders was born on January 12, 1954. Tr. 109. He graduated from high school in 1972, attended one year of college, and served in the Army from 1974 until 1977, at which time he was honorably discharged at the rank of E-4. Tr. 280, 470, 773. Sanders' work history includes employment with Boise Cascade as a warehouse order filler from 1975 to 1985. He apparently left that job and was off work for some period of time with a knee injury. Tr. 276. When he was released back to work, he was told they had nothing for him to do and was terminated. Tr. 824-25. Subsequently, he obtained a job with a commercial fishing company on a fish processing boat from 1990 to 1993. Tr. 135, 847-48. He ceased working for the fishing company in 1993 following an on-the-job injuries which began the course of symptoms which he contends render him disabled.

On March 29, 1994, Sanders was admitted to the VA Domicilliary's alcohol and drug treatment program. Tr. 334. Just over a year later, on April 26, 1995, while still in that program, Sanders was granted DIB by the SSA. Tr. 126. However, that award was terminated January 1, 1997, due to a finding that substance or alcohol abuse were a contributing factor.[2]

---

[2] This court does not have the benefit of the file generated as a result of Sanders' 1995 application as it was not ordered in connection with review of the present application. Tr. 126.

Sanders testified that, since 1997, he has had difficulties with both his shoulders which prevent him from lifting weights like he used, cut down on his ability to work, and cause him to experience pain when doing such household tasks as sweeping and picking up the garbage can. Tr. 812-15. He also has had problems with his hands and wrists which cause him to drop things three to four times per month and resulted in surgery on both arms. Tr. 815-16, 833. His right knee has a "trick joint" which is painful and caused him to fall three to four times per year between 1997 and March 1999, and that cost him his job in 1985. Tr. 818, 824-25. He experienced pain in the right side of his back which affected his ability to walk and sit, and his neck caused pain radiating down into his hands about four times per week. Tr. 819-20. His back problems made were exacerbated by bending at the waist. Tr. 833.

Also between 1997 and March 1999, Sanders experienced headaches at least three times per week that incapacitated him and that he rated at "above 10" for pain. Tr. 820-21. He routinely had difficulty sleeping due to pain. Tr. 825-26. He also has a longstanding problem with high blood pressure, which he controls with medication. Tr. 821-22. Sanders regularly would experience dizziness whenever he would do any climbing, and had difficulty coming down stairs. Tr. 827-28. He would be able to walk no more than eight city blocks without stopping to rest, and could walk or stand for no more than an hour out of an eight hour day. Tr. 831. Sanders would stop to rest about three times a day for three or four hours. Tr. 828-29. He could no longer run or jog or do weight training or swimming and could only walk for exercise. Tr. 830.

Sanders also testified that he has difficulty with concentrating and anger control. Tr. 834. His difficulties made him more cautious and slower at doing things, to the point that he could do

things less than half as fast as he could before March 1999. Tr. 835. By that time, his pain was at an "8" as much as half of the time. Tr. 835-36.

On February 22, 2000, approximately a year after Sanders' DIB insurance lapsed, the Department of Veterans Affairs ("VA") issued a Rating Decision finding Sanders 70% disabled. Tr. 196. That finding was based on a combination of Sanders' impairments, including personality disorder (30%), right shoulder impingement syndrome (20%), carpel tunnel syndrome (10% each right and left), meniscus tear right knee (10%), chronic low and mid back pain (10%), and sinusitis (10%).

## II. Medical Evidence

The court has carefully reviewed the voluminous medical records submitted with the administrative transcript. Neither party challenges the ALJ's summary of medical evidence describing Sanders' medical treatment and consultations between 1993 when Sanders began experiencing back and shoulder pain after his on-the-job injury,[3] as well as symptoms of carpal tunnel syndrome,[4] and 2002 when several physicians submitted reports documenting Sanders' conditions as of his date last insured. Tr. 17-20. Accordingly, it is not necessary to recount all the medical evidence here. Instead, the issue centers on what conclusion may be drawn from that evidence regarding Sanders' condition as of his date last insured, March 31, 1999. Sanders raises a variety of claims of error, each of which potentially impacts the consideration of specific evidence. Thus, this court considers each argument raised by Sanders and discusses any relevant medical evidence in that context.

---

[3] Tr. 505 (describing injury in February 1993).

[4] Tr. 495 (diagnosing carpal tunnel syndrome and possible cubital tunnel syndrome).

**III. VE Testimony**

The ALJ posed a hypothetical question to the VE, asking her to assume the claimant had an RFC for medium work but no repetitive overhead work, and nonexertional limitations as reflected in a Mental Medical Source Statement of Ability to Do Work-Related Activities completed by clinical psychiatrist, Jane Starbird, Ph.D., on July 30, 2002. Tr. 848, 778-79. The VE testified that a person with those restrictions and of Sanders' age, education, and prior work experience, could work as an inventory worker, janitor, and shipping and receiving checker. Tr. 849-50. If the worker was absent from the workplace two or more times per month due to pain, discomfort, and fatigue, competitive employment in these positions would be precluded. Tr. 850.

**DISCUSSION**

Sanders challenges the ALJ's rejection of his testimony, the testimony of his brother, and the reports submitted by his brother and sister. He also challenges the ALJ's conclusions at Steps Two, Three, and Five of the disability evaluation process. Although it seems unusual for Sanders to have been found disabled in 1995 but not disabled during the later period at issue here (from January 1, 1997, to March 31, 1999), this court concludes that the ALJ met his burden in concluding that Sanders was not under a disability as of his date last insured.

**I. Rejection of Testimony and Reports**

   **A. Sanders' Credibility**

Sanders argues that the ALJ improperly found that he "was not entirely credible" (Tr. 17) and failed to use the credibility factors required by Social Security Ruling ("SSR") 96-7p.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of

8 - OPINION AND ORDER

malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996).

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283. It is not sufficient for the ALJ to make a general assertion that a claimant is not credible. The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 917-18; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

When making a credibility evaluation, the ALJ may consider objective medical evidence together with the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment other than medication; measures used to relieve symptoms; and functional limitations caused by the symptoms. *Smolen*, 80 F3d at 1284. *See also* SSR 96-7p.

In addition, the ALJ may rely on

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . . The ALJ must also consider the claimants work record and the observations of treating and examining physicians and other third parties.

*Smolen*, 80 F3d at 1284 (citations omitted).

///

///

The ALJ found Sanders' testimony "concerning his impairments and their impact on his ability to work . . . not entirely credible in light of information contained in the medical reports and elsewhere in the record." Tr. 17. Following that statement, the ALJ discussed the medical records, focusing on the time period between Sanders' alleged onset date (January 1, 1997) and his date last insured (March 31, 1999). The ALJ expressly noted that in an examination by Dr. Ali Bahar in February 1999 just prior to the expiration of his insured status in March 1999, Sanders reported that he was doing well, which the ALJ found consistent with Dr. Bahar's recommendation that Sanders continue physical activity, suggesting that he was not very limited physically. Tr. 18, 218-20. Although Dr. Bahar diagnosed depression, Sanders' mood appeared "much better at this visit" and he expressed interest in the continued use of antidepressants, but with a medication change to avoid certain unpleasant side effects he was experiencing. Tr. 220. Sanders asked Dr. Bahar if he could take up jogging to help with his hamstring pain. Tr. 219. He also asked Dr. Bahar to recommend him for employment, which Dr. Bahar declined due to the need to deal with his ongoing cocaine abuse. Tr. 220.

All further examinations by Dr. Bahar were after Sanders' date last insured. However, the ALJ accurately notes that through March 2001, those examinations reveal that Sanders was continuing with his activities of daily living, continuing in drug rehabiliation, and exhibiting no serious pathology. Tr. 209-18. In sum, the record supports the ALJ's conclusion that Sanders' testimony – to the degree it purported to reflect his condition prior to March 31, 1999 – was inconsistent with the medical records of Dr. Bahar. Accordingly, the ALJ's reasoning in

rejecting Sanders' testimony based on the medical records was clear and convincing, and this court discerns no basis on which to reverse that rejection.

### B. Rejection of the Testimony and Reports of Sanders' Siblings

Sanders also argues that the ALJ improperly rejected the testimony and reports of his brother, Arthur Potts ("Potts"), and sister, Charlotte Taylor ("Taylor").

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill,* 12 F3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

The ALJ found the testimony of Potts unhelpful, primarily because he "appeared to know precious little about the claimant," including that Sanders "had been on parole for a felony, did not know [Sanders] was using cocaine, and knew very little about the work [Sanders] had done." Tr. 20. Additionally, the ALJ reviewed reports prepared by Potts on August 6, 2001 (Tr. 140-51) and Taylor on November 28, 2002 (Tr. 190-93). The ALJ "considered [those reports] credible to the extent they are consistent with the medical evidence." Tr. 21.

Potts testified that between January 1997 and March 1999, Sanders had difficulty walking and could walk only half a block without needing a rest. Tr. 841. Sanders also had difficulty using his hands, often dropping things. Tr. 842. Sanders seemed bothered by pain about 80% of the time, tired easily when doing yard work, resting about half an hour for every three to four minutes of work, and worked at about 25% of the pace of a normal person. Tr. 842-

43. Sanders was also irritable, lacked the ability to pay attention, and was unfocused. Tr. 843. Similar concerns are reflected in Potts's report, which repeatedly opines that mental issues need to be addressed.

Taylor, who was "asked by the family to live with [Sanders] and help him," completed a report indicating that Sanders had marked limitations in his activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. Tr. 190-93. She stated that Sanders has a poor memory, isolates himself, and exhibits "strange behavior . . . due to his mind racing, not because of drugs." Tr. 193.

The ALJ gave germane reasons for rejecting the testimony of Potts, and did not err in accepting the written reports only insofar as they were consistent with the medical evidence. *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001), citing *Vincent v. Heckler*, 739 F2d 1393, 1395 (9th Cir 1984). Moreover, like the testimony of Sanders, nothing in the medical reports reflects the kind of limitations suggested in Potts' testimony, and the written reports appear to reflect Sanders' condition as of the dates they were authored in August 2001 and November 2002. Accordingly, this court concludes that the ALJ did not err in rejecting this evidence to the extent it was inconsistent with the medical evidence in the record or was reflective of Sanders' condition after his date last insured.

## II. Failure to Find Severe Mental Impairment

The ALJ found that Sanders suffers from the severe impairments of a history of multiple arthralgias, status post carpal tunnel release, and alcohol and cocaine dependence/abuse. Tr. 16, 23 (Finding #3). The ALJ also concluded that nothing in the record showed that Sanders' other symptoms or conditions "are more than transient or cause significant vocational limitations."

Tr. 16. Sanders contends that the ALJ erred by failing to find that he has severe mental impairments, including depression, a pain disorder, and a personality disorder.

An impairment is severe for the purposes of Step Two of the evaluation process if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). "Basic work activities" are the abilities and aptitudes necessary to do most jobs. 20 CFR § 404.1521(b). These include abilities such as "understanding, carrying out and remembering simple instructions," "use of judgment" and "responding appropriately to supervision, coworkers and usual work situations." 20 CFR § 404.1521(b).

An impairment can be found "not severe" only if it is a minor abnormality that has no more than a minimal effect on the claimant's ability to work. *Smolen*, 80 F3d at 1290. The inquiry at Step Two is a *de minimis* screening tool to dispose of groundless claims. *Id.*

There is some evidence in the record of mental limitations. On April 1, 1994, Sanders underwent a psychological assessment upon admission to the VA Domicilliary. Tr. 559-67. At that time, Sanders' Axis I diagnosis included "psychological factors effecting physical condition," and his Axis II diagnosis was of a "Personality Disorder, not otherwise specified . . . includ[ing] dependent, passive-aggressive, antisocial and histrionic traits." Tr. 560. He was also found to have "severe" psychosocial stressors, including housing, financial, job and health problems. Tr. 560-61. His Global Assessment of Functioning was rated at 52, meaning "moderate to severe symptoms," including depression, guilt and psychosomatic pain. Tr. 561. In addition, two years later on July 25, 1996, Sanders exhibited symptoms of "major depression" and was being seen by the VA Mental Health Clinic. Tr. 273-79. These historical references to mental health issues are reflected in the diagnoses of depression peppered throughout the record

in later medical reports, including those of Dr. Bahar in February 1999 just prior to the expiration of Sanders' insured status.

The ALJ's written decision makes clear that although he purported not to find any severe mental impairments at Step Two, he nevertheless included certain mental limitations in his RFC analysis. As noted by Sanders, the ALJ adopted the findings in Dr. Starbird's July 30, 2002 report that he has moderate limitations in responding to work pressures in a usual work setting, as well as carrying out detailed instructions. Tr. 22 (adopting limitations found at Tr. 778-79). As explained in more detail below, the ALJ did not err in undertaking his analysis of Sanders' RFC, including his analysis of mental limitations that are supported by the record. As a result, the ALJ's failure to expressly find a "severe" mental impairment at Step Two was rendered harmless error by his RFC analysis.

### III. Failure to Include Limitations in RFC Analysis

Sanders also challenges the ALJ's RFC analysis. One of his primary arguments is that the ALJ failed to give adequate consideration to the finding of disability by the VA. In the Ninth Circuit, "an ALJ must ordinarily give great weight to a VA determination of disability." *McCartey v. Massanari*, 298 F3d 1072, 1076 (9th Cir 2002). However, a VA determination is not conclusive, and may be given less weight if the ALJ "gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id* (citation omitted).

In this case, the ALJ recognized the existence of the VA determination, noting that the SSA was "not bound by disability determinations made by other agencies, because of the different rules governing the definition and assessment of disability." Tr. 21, citing 20 CFR § 404.1504. At the same time, the ALJ recognized that "case law requires consideration be

given to [the VA] award." *Id*. The ALJ then declined to follow the VA determination, stating only that "our rules, the period under consideration and the claimant's poor credibility as demonstrated in the record and at the hearing preclude adoption of the VA's finding." *Id*. This is the only explanation offered by the ALJ as to why the VA determination was not followed.

One reason given by the ALJ must be disregarded. *McCartey* makes clear that even though the VA and SSA rules are different, the VA determination is still entitled to great weight. However, the other two reasons given by the ALJ are "persuasive, specific, and valid," and "supported by the record" as required by *McCartey*. The VA determination was issued about one year after Sanders' date last insured and does not indicate whether it was based in whole or in part on Sanders' condition prior to March 31, 1999, the relevant period at issue here. In addition, the ALJ found that Sanders was not entirely credible. As discussed above, that conclusion is supported by the evidence. Given the conclusory nature of the VA determination, it cannot be ascertained whether the VA had the benefit of the same testimony and medical records considered by the ALJ. Therefore, the ALJ did not err by giving the VA determination less than great weight.

The ALJ determined that Sanders retained the RFC to perform medium work, but which precluded repetitive, overhead work. Tr. 23-24 (Finding #5). The ALJ also concluded that Sanders had slight limitations in making judgments or simple work-related decisions, responding appropriately to changes in a routine work setting, and in understanding and remembering detailed instructions. *Id*. The ALJ also found moderate limitations in carrying out detailed instructions and responding to work pressures in a usual work setting. *Id*. Finally, the ALJ

concluded that Sanders had slight limitations in interacting with the public, supervisors, and co-workers, but no difficulty responding appropriately to them. *Id*.

Sanders primarily contends that the ALJ erred by rejecting the limitations suggested by Dr. Thomas Y. Nakata and Dr. Nathan Bachtell who examined Sanders in 2001 and 2002. However, as with his rejection of other testimony, the ALJ expressed legitimate concern with the lack of a link between those opinions and Sanders' condition prior to his date last insured. For example, the ALJ correctly noted that Dr. Nakata, who had four appointments with Sanders between December 2001 and January 2002, limited his report to observations made since his first examination of Sanders. Tr. 781. Additionally, Dr. Nakata was "unable to answer" a large percentage of the questions asked and expressly did not address Sanders' mental abilities and aptitude for work-related activities. Tr. 783-86. Thus, the ALJ did not err in giving little weight to Dr. Nakata's report.

Similarly, Dr. Bachtell, who saw Sanders three times between July 2001 and February 2002, stated that answers to many of the questions on the form were "unknown" to him, including whether Sanders was "self-medicating an underlying mental or emotional problem" and if not, whether the "underlying psychological problem [would] improve with time." Tr. 790-95.

Rather than credit those opinions, the ALJ instead gave more weight to the limitations found by Dr. Starbird, who examined Sanders on July 16, 2002, between the initial and supplemental hearings in this case. Because Dr. Starbird "indicated that prior records were considered in reaching [her] assessment" that Sanders had moderate limitations in carrying out detailed instructions and responding to work pressures, the ALJ found that those limitations in

his functioning were applicable to his date last insured and included them in his RFC analysis. Tr. 19, 24.

The only other limitation that Sanders contends should have been included in his RFC was the need for rest periods and water breaks. However, as discussed above, the ALJ properly found Sanders' testimony inconsistent with the medical records predating Sanders' date last insured. Thus, it was not error to exclude that limitation from the RFC analysis.

In sum, a detailed review of the record reveals no reversible error in the ALJ's RFC analysis.

## IV. **Ability to Perform Other Work in the Economy**

After assessing Sanders' RFC, the ALJ concluded that Sanders could no longer perform his past work. Thus, the burden shifted to the Commissioner to prove that Sanders could perform other jobs existing in significant numbers in the national economy. Based on his evaluation of Sanders' RFC and the testimony of the VE, the ALJ concluded that Sanders could perform medium work at an unskilled level, with no overhead lifting, and a few additional nonexertional limitations. Sanders contends that the ALJ failed to meet his burden of establishing that there is other work in the national economy that he could perform.

In step five, the Commissioner must show that the claimant can do other work which exists in the national economy. *Andrews*, 53 F3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant. *Id.* The assumptions in the hypothetical question must be supported by substantial evidence. *Id.*

Here, the ALJ elicited testimony from the VE with a hypothetical question that accurately reflected the limitations reasonably supported by the record as a whole, as found in the ALJ's RFC assessment. Sanders argues, however, that the VE provided erroneous information and identified occupations that require functions precluded by his RFC.

For information about the requirements of work, the Commissioner relies primarily on the Department of Labor publication *Dictionary of Occupational Titles* ("DOT") including its companion publication, *Selected Characteristics of Occupations*. 20 CFR Part 404, Subpart P, Appendix 2 200.00(b); see also SSR 00-4p. The ALJ may utilize a VE to provide more specific information. SSR 00-4p.

When a VE provides information about the requirements of an occupation, the ALJ has an affirmative duty to determine whether that information conflicts with the DOT and to obtain a reasonable explanation for the apparent conflict. The ALJ must resolve the conflict before relying on the testimony to find that a claimant is not disabled and must explain how the conflict was resolved. SSR 00-4p. An ALJ may rely on expert testimony which contradicts the DOT, but only if the record contains persuasive evidence to support the deviation. *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995).

The VE identified three jobs she thought a person with Sanders' RFC could perform, namely positions as an inventory worker, janitor, and shipping and receiving checker. Tr. 849-50. However, she mistakenly identified the inventory worker and the receiving checker as unskilled jobs. The Commissioner now acknowledges this error, but contends that the error was harmless because the VE also identified another job Sanders could perform that was unskilled, namely that of janitorial cleaner, DOT 381.687-018.

18 - OPINION AND ORDER

Sanders responds that the ALJ nevertheless failed to meet his Step Five burden because the VE only identified a single unskilled job and provided no foundation for the testimony about the numbers of jobs available in the local and national economies. Sanders is mistaken that one job title is an insufficient basis on which to make a Step Five determination: "Where the testimony of a VE is used at Step Five, the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy." *Osenbrock v. Apfel*, 240 F3d 1157, 1162-63 (9th Cir 2001) (citations omitted). Furthermore, a job title with 8,000 jobs in Oregon and more than 400,000 jobs nationwide is a sufficient number of available jobs. *See*, *Meanel v. Apfel*, 172 F3d 1111, 1115 (9th Cir 1999) (between 1,000 and 1,500 jobs sufficient); *Barker v. Secretary of Health and Human Servs.*, 882 F2d 1474, 1478-79 (9th Cir 1989) (1,266 jobs sufficient); *Martinez*, 807 F2d at 775 (between 3,750 and 4,250 jobs sufficient).

Sanders also argues that the VE's testimony lacked foundation. However, Sanders' attorney was notified that the VE would be testifying and raised no objections to her qualifications at the hearing. Tr. 105-08, 846. Her testimony concerning job numbers went unchallenged. Tr. 851-52. This court is not persuaded that the letters submitted by Sanders stating that the authors are not aware of the source of job incidence information (Tr. 74-77) undermine the VE's testimony, and therefore rejects Sanders' argument on this point.

Accordingly, the ALJ satisfied the Commissioner's burden at Step Five.

///

///

///

///

///

## **ORDER**

Based on the foregoing, the ALJ's determination was based on proper legal standards and supported by substantial evidence in the record. The Commissioner's final decision is AFFIRMED, and this case is DISMISSED.

DATED this 19th day of October, 2005.

/s  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge